**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| VALERIE M. ANDERSON AND GREG LEWIS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>DRIVESTREAM, INC. and ADMINISTRATORS OF THE TULANE EDUCATIONAL FUND D/B/A THE TULANE UNIVERSITY OF LOUISIANA A/K/A TULANE UNIVERSITY,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Valerie M. Anderson ("Anderson") and Greg Lewis ("Lewis" and, together with Anderson, "Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), bring this Class Action Complaint against Drivestream, Inc. ("Drivestream") and the Administrators of the Tulane Educational Fund D/B/A The Tulane University of Louisiana A/K/A Tulane University, ("Tulane" and, together with Drivestream, "Defendants") and allege, upon personal knowledge as to their own experience and upon information and belief and their counsel's investigation as to all other matters, as follows:

## I.    PRELIMINARY STATEMENT

1.    Plaintiffs bring this class action against Defendants for Defendants' failure to secure and safeguard highly sensitive data.

2.    Tulane is a private, non-profit university located in New Orleans, Louisiana.

3.    Tulane's workforce includes faculty, staff, student workers, volunteers, and others. Plaintiffs and all Class Members are or were members of Tulane's workforce.

1

4.      As a condition of their employment, Plaintiffs and all Class Members were required to provide Tulane with their personally identifying information ("PII").

5.      In March 2024, Tulane announced that it was replacing its on-premises finance, budget and planning, and human resources systems.

6.      Specifically, Tulane announced it was entering a migration phase to transition to the OracleCloud, a cloud-based information technology ("IT") platform.[1]

7.      Tulane partnered with Drivestream as its systems integration firm to implement Tulane's integration with Oracle Cloud's Fusion HCM, Cloud ERP, EPM Cloud, and Oracle Analytical Warehouse.

8.      Drivestream is an IT consulting and outsourcing company specializing in Oracle Cloud solutions for enterprise and institutional clients.

9.      The project was sweeping and "reach[ed] across faculty, managers, staff and student workers — anyone who manages a budget, submits expenses, recruits faculty or staff, hires and pays vendors, receives pay slips and benefits, leads a team, participates in a performance assessment and more.  And it [wa]sn't just an IT project — it [wa]s a major business transformation project for the university."[2]

10.      This project was scheduled to take place over the following two years, with the aim to go live in early 2026.

11.      Drivestream assisted Tulane with "all phases of the project, including preparation, development, testing, launch[,] and post-launch."

---

[1]  Tulane News, "Tulane kicks off transformation to the cloud with WaveWorks!" (Apr. 10, 2024) https://news.tulane.edu/news/tulane-kicks-transformation-cloud-waveworks  (*last   accessed*, May 8, 2026).

[2]  *Id.*

12.     Between December 4, 2024 and December 9, 2024 – in the middle of the Tulane – Drivestream partnership – Drivestream identified a data breach in its systems when cybercriminals infiltrated and accessed certain inadequately protected systems and downloaded files from those systems (the "Drivestream Data Breach").

13.     The Drivestream Data Breach exposed Class Members' names and financial information.

14.     This was part of a ransomware attack by the Akira cybercriminal group.

15.     Drivestream did not timely notify Tulane workforce members impacted by the Drivestream Data Breach.

16.     Additionally, upon information and belief, Drivestream chose to not timely notify Tulane itself of the Drivestream Data Breach.  In the alternative, if Drivestream did notify Tulane of the Drivestream Data Breach, Tulane chose not to notify the impacted Class Members.

17.     Drivestream finally mailed notice letters to impacted Class Members in late April 2026 – more than a year after the Drivestream Data Breach had occurred ("Drivestream Notice Letters").

18.     Class Members first became aware of the Drivestream Data Breach upon receipt of the Drivestream Notice Letters in late April/early May 2026.

19.     Tulane has never directly notified victims of the Drivestream Data Breach.

20.     Additionally, on August 10, 2025, unauthorized third parties accessed and acquired files stored in Tulane's Oracle E-Business Suite software ("Tulane Data Breach" and, together with the Drivestream Data Breach, "the Data Breaches").  These unauthorized third parties also accessed and acquired files from other institutions as part of the same breach.

21. The Tulane Data Breach involved overlapping categories of information impacted by the Drivestream Data Breach – names and financial information – but additionally included Class Members' Social Security numbers.

22. In mid-November 2025, a few months after the Tulane Data Breach, cybercriminals with Cl0p ransomware group identified certain institutions impacted by its attack.[3]

23. Specifically, the Cl0p ransomware group identified companies that refused to pay its ransom, identifying many educational institutions, including Tulane and others. For instance, the Cl0p ransomware group also identified other impacted educational institutions.

24. Other impacted educational institutions promptly notified impacted victims.

25. Upon information and belief, despite actual knowledge of the hack in mid-November 2025 (when it declined to pay the ransom), Tulane waited until April 2, 2026 to begin notifying victims of the Tulane Data Breach.

26. Tulane did not timely notify Tulane workforce members impacted by the Tulane Data Breach.

27. Tulane finally mailed notice letters to impacted Class Members in mid-April 2026 ("Tulane Notice Letters").

28. Class Members first became aware of the Tulane Data Breach upon receipt of the Tulane Notice Letters in mid-April 2026.

29. Plaintiffs are victims of the Data Breaches. Each Plaintiff received a Drivestream Notice Letter and a Tulane Notice Letter. Plaintiffs bring this class action on behalf of themselves and all others harmed by Defendants' misconduct.

---

[3] "Dartmouth College Confirms Data Theft in Oracle Hack" (Nov. 26, 2025), https://www.securityweek.com/dartmouth-college-confirms-data-theft-in-oracle-hack/amp/ (*last accessed*, May 8, 2026).

30.    Prior to the Data Breaches, Plaintiffs private information was exactly that – private. To the best of their knowledge, neither Anderson nor Lewis had been the victim of a data breach prior to these incidents.

31.    Now, as a direct result of Defendants' misconduct, Plaintiffs' PII is exposed and unsecured.

32.    Plaintiffs and Class Members have incurred and/or will incur actual damages as a result of the Data Breaches, including, among other things, diminution of the value of their PII data and postage costs for remedial action necessitated by the breaches.

33.    Plaintiffs bring claims against Defendants for (i) negligence, (ii) unfair trade practices under the Louisiana Unfair Trade Practices Act ("LUTPA") for all Louisiana residents, and (iii) unjust enrichment (against Drivestream only).

## II.    PARTIES

34.    Plaintiff Anderson is an adult, who at all relevant times, was a resident and citizen of Orleans Parish, State of Louisiana.  Anderson did not receive a notice from Tulane informing her that her PII had been compromised during the Tulane Data Breach until approximately April 9, 2026.  Anderson did not receive a notice from Drivestream informing her that her PII was exposed until May 5, 2025.

35.    Plaintiff Lewis is an adult, who at all relevant times, was a resident and citizen of Orleans Parish, State of Louisiana.  Lewis did not receive a notice from Tulane informing him that his PII had been compromised during the Tulane Data Breach until approximately the week of April 13, 2026.  Lewis did not receive a notice from Drivestream informing him that his PII was exposed until May 4, 2025.

36.     Defendant Drivestream is a Virginia corporation with its principal place of business at 1602 Village Market Blvd SE, Suite 400, Leesburg, Virginia.

37.     Defendant Tulane is a Louisiana non-profit corporation with its principal place of business located at 6823 St. Charles Avenue, Suite 300, New Orleans, Louisiana 70118.

## III.     JURISDICTION AND VENUE

38.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).

(a)     The amount in controversy exceeds $5 million, exclusive of interest and costs.[4]

(b)     Minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).    Drivestream is a Virginia citizen.  Tulane is a Louisiana citizen.  Plaintiffs (Louisiana) have different citizenship from Drivestream (Virginia).  Additionally, many Class Members are citizens of other states, including the District of Columbia, Maryland, New York, North Carolina, West Virginia, and Rhode Island (neither Tulane nor Drivestream is a citizen of any of those states).  A high percentage of Tulane workers are not Louisiana citizens.  For instance, approximately 85% of Tulane undergraduates are from out-of-state.[5]

---

[4]    Credit monitoring can cost between $10-$30 per month per individual.    *See, e.g.*, COMPLIANCYGROUP, "The Hidden Costs of a Healthcare Data Breach," https://compliancy-group.com/the-hidden-costs-of-a-data-breach/ (*last accessed*, May 8, 2026).    Because the compromised PII includes Social Security numbers, the need for credit monitoring will continue throughout each Class Member's lifetime.  Tulane currently has 4,600 full-time employees. *See, e.g.*, "Faculty & Staff," https://tulane.edu/faculty-staff. (*last accessed*, May 8, 2026).  As such, the amount in controversy easily exceeds the jurisdictional amount.  Even just considering current, full-time employees (*i.e.*, excluding part-time employees and former employees), damages exceed the jurisdictional amount for a lifetime of credit monitoring ($30/month x 12 months = annual cost of $360 per person x 4,600 full-time employees = $1,656,000 for a single year, when a lifetime of credit monitoring is required).

[5]    "Tulane at a Glance," https://admission.tulane.edu/why-tulane/at-a-glance (*last accessed*, May 8, 2026).

39.     The Court has general personal jurisdiction over Defendants because, personally or through their agents, Defendants operate, conduct, engage in, or carry on a business or business venture in this State. Tulane is located at 6823 St. Charles Avenue, Suite 300, New Orleans, Louisiana 70118. Drivestream specifically entered into a partnership with Tulane University. Defendants committed tortious and otherwise wrongful acts in Louisiana.

40.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Tulane is based in this District, and the acts and omissions giving rise to Plaintiffs' and Class Members' claims occurred in and emanated from this District.

## IV.     BACKGROUND

### A.     Tulane Collected and Stored Plaintiffs' and Class Members' PII

41.     Tulane is the largest private employer in New Orleans.

42.     Tulane currently has more than 4,500 full-time employees.[6]

43.     Tulane also has many other part-time and student employees. For instance, Tulane has approximately 3,000 student workers.[7]

44.     Members of Tulane's workforce are required to provide their PII as a condition of their employment contracts.

---

[6] "Faculty & Staff," https://tulane.edu/faculty-staff. (*last accessed*, May 8, 2026).

[7] AP NEWS, "Tulane: lowest staff wage moving to $15/hour, student to $10," (Aug. 20, 2021) http://apnews.com/article/business-education-511c26ee05ba3465e7319c6a3430f899       (*last accessed*, May 8, 2026).

45.   In March 2024, Tulane announced that it would be replacing its on-premises finance, budget and planning, and human resources systems to a cloud-based IT platform with Oracle Cloud.[8]

46.   To implement this change, Tulane partnered with Drivestream – an IT consulting and outsourcing company specializing in Oracle Cloud solutions.

47.   In announcing this, Tulane touted Drivestream's expertise, stating: "The firm has helped 200+ organizations transition to the cloud."[9]

48.   In collecting, obtaining, accepting, managing, storing, maintaining, and processing Plaintiffs' and Class Members' PII as a condition of their employment, Tulane agreed it would safeguard the electronic information/data in accordance with its internal policies, state law, and federal law.

49.   Tulane acknowledges these duties in its "Privacy Notice",[10] noting, among other things:

> Tulane University is committed to respecting your privacy.
>
> *   *   *
>
> Should you choose to provide us with any personal information, you can be assured that it will be used only by Tulane University to conduct official university business, and personal information will not be disseminated to an unaffiliated third party.

---

[8] Tulane News, "Tulane kicks off transformation to the cloud with WaveWorks!" (Apr. 10, 2024) https://news.tulane.edu/news/tulane-kicks-transformation-cloud-waveworks (*last accessed*, May 8, 2026).

[9] *Id.*

[10] "Privacy Notice," https://tulane.edu/privacy-notice-0 (*last accessed*, May 8, 2026).

50.     Tulane further acknowledges these duties in its "Data Management Policy",[11] declaring, among other things:

> All University Data, which includes . . . Administrative Data, is owned by [Tulane]. As such, all members of the [Tulane] community must appropriately use and safeguard the data, in all formats and all locations. This policy establishes uniform data management standards for [Tulane's] Data and identifies the shared responsibilities for assuring the security of [Tulane's] Data and that [Tulane's] Data efficiently and effectively serve the needs of the University.
>
> **Purpose and Scope**
>
> For [Tulane] to effectively manage and safeguard its data, procedures must be in place to guide appropriate access to and ensure the security of [Tulane's] Data and provide a means to address exceptions. The following guiding principles apply to the management and safeguarding of [Tulane's] Data:
>
> - [Tulane's] Data are valuable assets that have value and should be managed and protected accordingly.

51.     Tulane is also aware of and acknowledges the existence of Louisiana's "Database Security Breach Notification Law."[12]

### B.     Drivestream Collected and Stored Plaintiffs' and Class Members' PII

52.     Drivestream's business is built around helping universities and other institutions manage their most sensitive operational functions – human resources, finance, payroll, and student administration – through Oracle Cloud IT applications.[13]

---

[11] "Data Management Policy," (updated Aug. 15, 2025), https://policy.tulane.edu/policy/data-management-policy-0 (*last accessed*, May 8, 2026).

[12] "Louisiana Security Breach Notification Law," https://it.tulane.edu/louisiana-security-breach-notification-law (*last accessed*, May 8, 2026).

[13] DRIVESTREAM, Homepage, https://drivestream.com/ (*last accessed*, May 8, 2026).

53.    Higher education is one of Drivestream's core markets.  It is listed first on the Drivestream website's dropdown list of industries served.  Drivestream claims to "[e]levat[e] [h]igher [e]ducation with Oracle Cloud [e]xpertise."[14]

54.    Drivestream does not merely implement Oracle systems and walk away.  To the contrary, it provides "an ongoing operational intelligence layer inside its clients' Oracle environments."[15]

55.    In describing its partnership with Tulane, Drivestream emphasized it was a "recognized leader in Oracle Cloud applications."[16]

56.    Drivestream also stated that its "Invested Partner Model" set it apart and that its partnership with Tulane "leverage[d] Drivestream's comprehensive suite of services - planning, implementation, and ongoing production support of Oracle Cloud applications[.]"[17]

57.    Drivestream shares risks with its institutional clients like Tulane.  The Drivestream website states: "We partner with you end-to-end, sharing risk and owning results, so you capture value faster and keep it for the long haul."[18]

---

[14]    DRIVESTREAM, "Elevating Higher Education with Oracle Cloud Expertise," https://info.drivestream.com/highereducation (*last accessed*, May 8, 2026).

[15]    DRIVESTREAM, Homepage, https://drivestream.com/ (*last accessed*, May 8, 2026).

[16]    DRIVESTREAM, "Embracing the Future: How Tulane University and Drivestream are Pioneering Oracle Cloud Transformation in Higher Education," https://info.drivestream.com/blog/tulane-transformation (*last accessed*, May 8, 2026).

[17]    DRIVESTREAM, "Embracing the Future: How Tulane University and Drivestream are Pioneering Oracle Cloud Transformation in Higher Education," https://info.drivestream.com/blog/tulane-transformation (*last accessed*, May 8, 2026).

[18]    DRIVESTREAM, "Redefining Consulting to Deliver Outcomes—Not Billable Hours," https://drivestream.com/drivestream-way (*last accessed*, May 8, 2026).

58.     As such, Drivestream stores, holds, processes, prepares, implements, manages, and supports Tulane as an ongoing "invested partner" with PII of the Plaintiffs and Class Members.[19] Plaintiffs and Class Members are current and former Tulane workers, employees, and volunteers.[20]

59.     Defendants had a duty to keep Plaintiffs' and Class Members' PII confidential, to protect it from unauthorized access and disclosure, and to timely notify of breaches under federal and state law.  La. Rev. Stat. § 51:3074; Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, *et seq*.

60.     In collecting, obtaining, accepting, managing, storing, maintaining, and processing Plaintiffs' and Class Members' PII through its partnership with Tulane, Drivestream recognized its duties.  Specifically, it declares in its "Privacy Policy",[21] among other things:

**Information Retention**

We retain personal information that we collect for as long as we need to use it in connection with our business and in accordance with our standard practices or in compliance with applicable laws.  When we no longer need the personal information, we will deidentify, aggregate, or delete this information where required by law.

*        *        *

Categories of Sources.  We collect personal information from the following categories of sources:

You;
Our affiliates and joint venture partners;
Our business partners;

---

[19]  "Class" is defined in Section VII, Class Action Allegations, *infra*.

[20]  Tulane News, "Tulane kicks off transformation to the cloud with WaveWorks!" (Apr. 10, 2024) https://news.tulane.edu/news/tulane-kicks-transformation-cloud-waveworks   (*last   accessed*, May 8, 2026).

[21]   DRIVESTREAM, "Privacy   Policy,"   https://drivestream.com/privacy-policy (*last   accessed*, May 8, 2026).

Our service providers, including analytics providers; and

Advertising companies and networks.

## C.      Data Breaches Can Be Prevented

61.      Data breaches can be prevented through proper security measures.  The Federal Bureau of Investigation emphasizes that "[p]roactive [p]revention is the [b]est [d]efense" against ransomware.[22]

62.      Defendants could have prevented these Data Breaches by properly encrypting and protecting equipment and computer files containing the PII by following FTC Guidelines, statutory requirements, and industry standards.

63.      The FTC sets guidelines for data security principles and practices.  For instance, in *Protecting Personal Information: A Guide for Business*, the FTC declared businesses must, among other things, protect the information that they keep, properly dispose of the information they no longer need, understand the vulnerabilities of their computer systems, and follow expert advice. [23]

64.      The same report tells businesses to "[c]heck expert websites (such as www.us-cert.gov) and your software vendors' websites regularly for alerts about new vulnerabilities, and implement policies for installing vendor-approved patches to correct problems."[24]

65.      Finally, the report cautions businesses that their security practices depend on the practices of their vendors.  It cautions businesses to vet vendors, verify vendor compliance, and ensure that vendors notify the businesses of any security incidents:

---

[22]      *How to Protect Your Networks from Ransomware*, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (*last accessed* May 8, 2026).

[23]  *Protecting Personal Information: A Guide for* Business, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (*last accessed* May 14, 2026).

[24]  *Id.*

12

*Security Practices of Contractors and Service Providers*

Your company's security practices depend on the people who implement them, including contractors and service providers.

- Before you outsource any of your business functions—payroll, web hosting, customer call center operations, data processing, or the like—investigate the company's data security practices and compare their standards to yours. If possible, visit their facilities.
- Put your security expectations in writing in contracts with service providers. Then, don't just take their word for it—verify compliance.
- Insist that your service providers notify you of any security incidents they experience, even if the incidents may not have led to an actual compromise of your data.

66.    Defendants should have implemented industry standard cybersecurity measures including, but not limited to: (i) establishing training programs to educate their employees about these risks; (ii) deploying robust spam filters to block phishing emails from reaching users; (iii) implementing email authentication protocols such as Sender Policy Frameworks to prevent email spoofing; (iv) scanning emails to detect and filter threats; (v) setting up strategic firewall configurations to block malicious IP addresses; (vi) running automatic antivirus and anti-malware scans regularly; and (vii) using whitelisting to ensure only known and authorized programs were executed.

67.    For instance, Microsoft, in its *Microsoft Digital Defense Report*, recommends additional security measures that companies should implement and, by extension, that Defendants should have implemented.  These include: (i) hardening internet-facing assets and identifying and securing perimeter systems; (ii) securing internet-facing remote desktop protocol services behind a multifactor authentication gateway; (iii) building credential hygiene; (iv) applying the principle

13

of least-privilege; (v) applying other "zero trust" principles; (vi) keeping systems up to date; and (vii) using multifactor authentication.[25]

68.     Upon information and belief, Defendants did not implement these FTC Guidelines or industry standards.

69.     Given that Defendants collected, obtained, accepted, managed, stored, maintained, and/or processed PII, implementing these security measures was both necessary and feasible.  The occurrence of the Data Breaches demonstrates Defendants' failure to adequately implement FTC Guidelines and industry standards, resulting in the exposure of Plaintiffs' and Class Members' PII.

## V.    DRIVESTREAM AND TULANE'S DATA WAS BREACHED

### A.    Drivestream's Data Was Breached

70.     Between December 4, 2024 and December 9, 2024, an "unauthorized actor accessed certain systems within the [Drivestream] data center that stored information and downloaded certain files from those systems."  *See, e.g.*, Ex. 1, Anderson Drivestream Notice Letter.

71.     Drivestream first observed this "suspicious activity at its data center" on or around December 9, 2024.

72.     Drivestream did not notify victims at that time.

73.     Instead of promptly notifying Class Members of the unauthorized access, Drivestream chose to attempt to investigate internally, depriving Plaintiffs and Class Members of the opportunity to implement prompt, precautionary mitigation measures.

---

[25]    *Microsoft Digital Defense Report: Building and improving cyber resilience*, https://www.microsoft.com/en-us/security/security-insider/threat-landscape/microsoft-digital-def ense-report-2023 (*last accessed* Oct. 7, 2025).

14

74.    Drivestream unreasonably delayed notifying Plaintiffs and Class Members while it conducted an internal investigation.

75.    This unreasonable delay exceeded the 60-day notification requirement under Louisiana state law.

76.    Drivestream waited until late April 2026, *before it even started* notifying Plaintiffs and Class Members about the Drivestream Data Breach.

77.    Drivestream's notification was issued through Drivestream Notice Letters.  These Drivestream Notice letters were form notice letters dated April 29, 2026.  These letters were untimely.

78.    Although Drivestream vaguely states that it is reviewing its "policies, procedures, and processes related to the storage and access of personal information to reduce the likelihood of a similar future event," the Drivestream Notice Letter does not identify any of the specific measures Drivestream or its cybersecurity vendors, if any, who are aiding in its response, are taking.

79.    This lack of transparency forces Plaintiffs and Class Members to speculate about the whereabouts of their PII, the full extent of the information exposed, and the steps Drivestream has actually taken, if any, to strengthen Drivestream's information security systems and monitoring capabilities to prevent future incidents.

**B.    Akira's Role in the Drivestream Data Breach**

80.    The cybercriminals responsible for obtaining information from Drivestream are believed to be the well-known ransomware group operating under the name "Akira."[26]

---

[26] *Drivestream*, BREACHSENSE (Jan. 8, 2025) https://www.breachsense.com/breaches/drivestream-data-breach/ (*last accessed* May 13, 2026).

15

81. Akira's destructive reach has drawn attention at the highest levels of federal law enforcement.

82. The Federal Bureau of Investigation ("FBI"), the Cybersecurity and Infrastructure Security Agency ("CISA"), and other leading governmental organizations took the unusual step of issuing a joint Cybersecurity Advisory ("CSA") about the group's activities.  That joint CSA stated, in relevant part:

> [N]ew Akira ransomware activity [] presents an imminent threat to critical infrastructure.

> \* \* \*

> Akira threat actors primarily target small- and medium-sized businesses, but have also impacted larger organizations across various sectors. They have a notable preference for educational institutions[.]

> \* \* \*

> Since March 2023, Akira ransomware threat actors have impacted a wide range of businesses and critical infrastructure entities in North America, Europe, and Australia.

> \* \* \*

> As of late September 2025, Akira ransomware has claimed approximately $244.17 million (USD) in ransomware proceeds.

> \* \* \*

> FBI and cybersecurity researchers observed Akira threat actors obtaining initial access to organizations through a virtual private network (VPN) service without multifactor authentication (MFA) configured[.]

> \* \* \*

> Akira threat actors leverage tools such as FileZilla and WinRAR to collect data and WinSCP and RClone to exfiltrate data[.]

> \* \* \*

> After exfiltrating data, Akira threat actors use a double-extortion model, which involves threat actors both encrypting systems and threatening to leak sensitive information.

16

\*        \*        \*

The Akira ransom note provides each company with a unique code and instructions to contact the threat actors via a .onion URL, which is accessible through the Tor network.

(Note: Tor, short for The Onion Router, is a decentralized network designed to anonymize internet traffic by routing it through multiple servers, encrypting data at each step. This network is often leveraged by threat actors to conceal their identities and activities, enabling secure and anonymous communication channels for malicious purposes, such as ransomware negotiations.).

Akira threat actors do not leave an initial ransom demand or payment instructions on compromised networks and do not relay this information until contacted by the victim.  Victims make ransom payments by using Bitcoin to cryptocurrency-wallet addresses provided by the Akira threat actors.  To further apply pressure, Akira threat actors threaten to publish exfiltrated data on the Tor network, and in some instances have called victimized companies, according to FBI reporting.[27]

83.    Akira has developed a well-documented pattern of publishing and selling stolen data through Dark Web channels.  For instance, Aviva – a multinational insurance firm – documented this behavior, stating that:

Their unique site on the dark web allows visitors (including the victims and media) to navigate via typed commands and see lists of "hacked companies" and upcoming data releases.

\*        \*        \*

Akira maintains a dark web leaks blog where they name victims and post sample data to prove the validity of the breach.

\*        \*        \*

---

[27] *Joint Cybersecurity Advisory, #StopRansomware: Akira Ransomware*, FBI, CISA, Department of Defense Cyber Crime Center, Department of Health and Human Services; Europol's European Cybercrime Centre; France's Office Anti-Cybercriminalite (OFAC) – French Cybercrime Central Office; Germany's Generalstaatsanwaltschaft Karlsruhe – Cybercrime-Zentrum Baden-Württem berg and Landeskriminalamt Baden-Württemberg, and the Netherlands's National CyberSecurity Centre (*published* Apr. 18, 2024, *updated* Nov. 13, 2025), https://www.cisa.gov/sites/default/files /2025-12/aa24-109a-stopransomware-akira-ransomware.pdf (internal citation links omitted) (*last accessed* May 13, 2026).

17

Akira will often publish the data on their site which other criminals can use to exploit.[28]

84.    In this case, on or around January 7, 2025, Akira made a Dark Web posting.  In that ransom note, it identified Drivestream, noting its role as a management and IT consulting firm specializing in migrating the enterprise business processes of businesses to the Cloud and threatened that it was ready to upload more than 80 GB of private corporate documents PII, emphasizing their imminent upload.[29]

85.    Upon information and belief, Akira disseminated Plaintiffs' and Class Members' PII on the Dark Web on or after January 7, 2025.

86.    Upon information and belief, Akira sold Plaintiffs' and Class Members' PII to other bad actors via Dark Web transactions on or after January 7, 2025.

**C.    Tulane's Data Was Breached**

87.    On or around August 10, 2025, an "unauthorized parties . . . access[ed] and acquire[d] files stored" in Tulane's workforce management business system.  *See, e.g.*, Ex. 2, Anderson Tulane Notice Letter.

88.    Upon information and belief, Tulane was aware of the breach by mid-November 2025, since it refused to pay the ransom at that time and, as a result, was publicly named as a victim company.

89.    Tulane did not notify impacted victims at that time.

---

[28] *Cyber – Akira Ransomware*, *Aviva* (Nov. 14, 2025), *https*://static.aviva.io/content/dam/docum ent-library/risk-solutions/cyber_akira_ransomware_lps.pdf (*last accessed* May 13, 2026).

[29]    [AKIRA] – Ransomware Victim: Drivestream, REDPACKET SECURITY, (Jan. 7, 2025), https://www.redpacketsecurity.com/akira-ransomware-victim-drivestream/ (*last accessed* May 13, 2026).

90.    Instead of promptly notifying Plaintiffs and Class Members of the unauthorized access, Tulane chose to attempt to investigate internally, depriving Plaintiffs and Class Members of the opportunity to implement prompt, precautionary mitigation measures.

91.    Tulane unreasonably delayed notifying Plaintiffs and Class Members while it conducted its internal investigation described above.

92.    This unreasonable delay exceeded the 60-day notification requirement under Louisiana state law.

93.    Tulane waited until early April 2026, *before it even started* notifying Plaintiffs and Class Members about the Tulane Data Breach.

94.    Tulane's notification was issued through the Tulane Notice Letters dated April 2, 2026.  The Tulane Notice Letters were untimely.

95.    Although Tulane vaguely states that it is working with vendors, including its "third-party cybersecurity vendors," to ensure the vulnerability has been eliminated, the Tulane Notice Letters do not identify any of the measures it is taking.

96.    Tulane does not identify its cybersecurity vendors, nor does it clarify if Drivestream is involved in the new preventative measures Tulane is taking to "help prevent something like this from happening in the future."

97.    This lack of transparency forces Plaintiffs and Class Members to speculate about the whereabouts of their PII, the full extent of the information exposed, and the steps Defendants have actually taken, if any, to strengthen Tulane's information security systems and monitoring capabilities to prevent future incidents.

19

D.      **Defendants' Notification Delays and Their Impact**

98.     Plaintiffs and Class Members were wholly unaware of the Drivestream Data Breach and the Tulane Data Breach until they received the Drivestream Notice Letters and Tulane Notice Letters, respectively.

99.     Time is of the essence when trying to protect against identity theft after a data breach, so early notification is critical.

100.    Yet, due to Defendants' delays, Plaintiffs' and Class Members' PII was in the hands of unauthorized individuals, including cybercriminals, long before Defendants started to send Drivestream Notice Letters and Tulane Notice Letters to Plaintiffs and Class Members.

101.    It was approximately 16 months before Plaintiffs and Class Members were made aware of the Drivestream Data Breach or were otherwise alerted that they needed to take action to protect themselves from that breach.

102.    It was approximately four months before Plaintiffs and Class Members were made aware of the Tulane Data Breach or were otherwise alerted that they needed to take action to protect themselves from that breach.

103.    As a result of the Data Breaches, Defendants encourage Plaintiffs and Class Members to take a range of protective measures.  Drivestream recommends: (1) reviewing account statements and monitoring their credit; (2) placing a security freeze on their credit files; (3) placing fraud alerts on their credit reports; and (4) activating credit monitoring and identity theft protection services. Tulane recommends (1) obtaining credits reports to review accounts; (2) placing a security freeze on credit files; (3) placing fraud alerts on credit reports; and (4) activating credit monitoring.  These recommendations are a tacit admission of the imminent risk of identity theft faced by Plaintiffs and Class Members.

20

104. Due to Defendants' notification delays, Plaintiffs and Class Members were deprived of the opportunity to take timely protective measures. Once they finally received notice, Plaintiffs promptly began the process of implementing protective measures, including, *inter alia*, mailing credit report requests.

105. Both Defendants are offering credit monitoring through their preferred vendors.

106. Additionally, Drivestream is also offering identity theft protection services, and Tulane is also offering fraud assistance. Both of these additional services are also being offered through Defendants' preferred vendors.

107. These services are only being offered by each defendant for one year. Nonetheless, the fact that Defendants have offered these services is a further acknowledgment that the impacted victims are subject to a substantial and imminent threat of fraud and identity theft.

108. Plaintiffs' and Class Members' PII was accessed in the Drivestream Data Breach and, upon information and belief, in the Tulane Data Breach. Plaintiffs and Class Members reasonably believe their exposed PII is currently available for sale on the Dark Web because that is the modus operandi of cybercriminals who target businesses that collect highly sensitive PII by engaging in unauthorized access of data files.

109. Defendants have obligations, including, but not limited to, voluntarily assumed duties, industry standards (*e.g.*, email authentication, spam filters), statutes, and custom, to keep Plaintiffs' and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

110. Defendants could have prevented or mitigated these Data Breaches by, among other things, better securing their network, properly encrypting their data, or, in the case of Tulane, better selecting and supervising its information technology partners. Defendants' negligence in

21

safeguarding Plaintiffs' and Class Members' PII was exacerbated by the known risk trends arising from data breaches and cyberattacks involving protecting and securing sensitive data, as evidenced by the trending data breach attacks in recent years.  For instance, in December 2023, *The Wall Street Journal* published "Cybersecurity in the Year Ahead:  Think 2023 on Steroids" forecasting rising cybersecurity threats in 2024.[30]  Indeed, in 2024 global cyberattacks rose 44%.[31]

**E.      Tulane's PII Is Valuable Property, and the Data Breach Diminished Its Value**

111.    The significance of a data breach and the value of the exposed personal information depends on the nature of the particular data exposed.  For instance, while credit card numbers can be changed, certain pieces of data – like Social Security numbers – are immutable.  Here, as discussed above, the most sensitive category of data was exposed –the "gold standard" in identity theft, Social Security numbers.

112.    According to one senior director at RedSeal, a network security risk analytics company, PII like the information involved in the Tulane Data Breach is worth more than 10x credit card information on the black market.[32]

---

[30] Kim S. Nash, *Cybersecurity in the Year Ahead: Think 2023 on Steroids*, WALL ST. J., December 27, 2023, https://www.wsj.com/articles/cybersecurity-in-the-year-ahead-think-2023-on-steroids-ab711f4e?gaa_at=eafs&gaa_n=ASWzDAjgqsEwvHr1nUoUmotbruCLxDH57BgP083_8ZJVsm3 gkSF5-CiBHtF4&gaa_ts=68e4148d&gaa_sig=ErYO1Rn3JK5ONYZI6nESev1FgOo4flPPE76If 6wjvFEGJ86Diiz4DYOmpkF5BMZ2JOUggGh1_HUMXBy8w0FB5w%3D%3D (*last accessed*, May 8, 2026).

[31] Colin Kellaher, *Aflac Says Personal Info May Have Been Stolen in Cyberattack*, WALL ST. J., June 20, 2025, https://www.wsj.com/tech/cybersecurity/aflac-says-personal-info-may-have-been-stolen-in-cyberattack-7bde3fa9. (*last accessed*, May 8, 2026).

[32] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, NETWORKWORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/ anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html    (*last accessed*, May 8, 2026).

113.   Experian reports that the average price for bank account details on the dark web is $30-$4,255.[33]

114.   Individuals' data also has value on reputable, clearnet marketplaces.  For instance, individuals can choose to sell their own data in exchange for cash, cryptocurrency, or discounts.[34]

115.   Electronic data, like the PII at issue in this case, is classified as corporeal movable property under Louisiana's Civil Code.  La. C.C. art. 471; *Intelligent Mortg. & Consult. Servs. LLC v. Arbor Lending Grp., L.L.C.*, 371 So. 3d 554 (La. App. 1 Cir. 2023) (collecting and analyzing cases categorizing electronic data as corporeal movable property under Louisiana law); *see also* La. R.S. § 14:73.1 (defining property to electronically stored or produced data under Louisiana's criminal law).

116.   Due to supply and demand, when a data breach exposes an individual's PII, the value of that PII diminishes.

## VI.   PLAINTIFF-SPECIFIC FACTUAL ALLEGATIONS

### A.   Anderson's Experience

117.   Anderson is a former Tulane employee.  She worked at Tulane for approximately 23 years.

118.   Tulane collected, obtained, accepted, managed, stored, maintained, and processed Anderson's PII as a condition of her employment.

119.   Anderson greatly values her privacy and is very careful with her PII.

---

[33]   Ben Luthi, *Here's What Your Data Sells for on the Dark Web*, Experian, June 30, 2025, https://www.experian.com/blogs/ask-experian/heres-how-much-yourpersonal-information-is-selling-for-on-the-dark-web/ (*last accessed*, May 8, 2026).

[34]   https://datacoup.com/ (*last accessed*, May 9, 2025).

120. For instance, Anderson avoids using digital methods to store and transfer PII when possible. Instead, Anderson stores any physical documents containing PII in a safe and secure location.

121. Anderson has never knowingly transmitted crucial PII, such as her Social Security number, over unsecured networks.

122. When Anderson does entrust others (including Tulane) with her PII, she only does so when necessary, such as when it is a condition of employment. Even then, she only provides her PII to others with the understanding that such information will be reasonably safeguarded from foreseeable threats; that it will only be shared when necessary; that it will only be shared with persons and entities that are properly vetted and overseen; and that she will be timely notified if her data is exposed.

123. On or about April 9, 2026, she received a Tulane Notice Letter dated April 2, 2026. The Tulane Notice Letter notified her for the first time that her PII (name, Social Security number, direct deposit information, and banking information) had been exposed, accessed, and/or acquired. *See* Ex. 2, Anderson Tulane Notice Letter.

124. Through the Tulane Data Breach, Defendants caused or contributed to Anderson's PII being exposed, thereby injuring her property.

125. Recognizing the present, immediate, and substantially increased risk of harm Class Members face, the Tulane Notice Letter offers impacted individuals a one-year subscription to an identity protection support program.

126. The Tulane Notice Letter further instructs Class Members to take an array of measures to protect their personal information, including ordering a copy of their credit reports

24

from Experian, Equifax, and TransUnion, setting up a fraud alert on their credit, and/or implementing a credit or security freeze by contacting Experian, Equifax, and TransUnion.

127.   On or about May 5, 2026, Anderson received a Drivestream Notice Letter dated April 29, 2026.  The Drivestream Notice Letter notified her for the first time that her PII (name, financial account number, and routing number) had been exposed, accessed, and downloaded between December 4, 2024 and December 9, 2024.  *See* Ex. 1, Anderson Drivestream Notice Letter.

128.   The Drivestream Notice Letter explained its role as an IT consulting company hired to facilitate Tulane's migration of employee data to its new human capital management system. The letter explained that, as part of that process, Anderson's PII was "present within [Drivestream's] systems" and that unauthorized actors accessed those systems and downloaded files from it.

129.   Through the Drivestream Data Breach, Defendants caused or contributed to Anderson's PII being exposed, thereby injuring her property.

130.   Recognizing the present, immediate, and substantially increased risk of harm Class Members face, the Drivestream Notice Letter offers impacted individuals a one-year subscription to a credit monitoring and identity theft protection service.

131.   The Drivestream Notice Letter also encourages Class Members to take measures to protect their personal information, including setting up a fraud alert and/or credit freeze by contacting Experian, Equifax, and TransUnion and requesting credit reports to monitor the reports for suspicious activity.

132.   Anderson provided her PII to Tulane and, through Tulane, to Drivestream, and trusted Defendants to use reasonable measures to protect it according to Defendants' internal

policies and federal and state law.  Defendants collected, obtained, and accepted Anderson's PII. Defendants continue to manage, store, maintain, and/or process Anderson's PII and have a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

133.   In the wake of the Data Breaches, Anderson has suffered from a surge in spam telephone calls, particularly calls dealing with financial and insurance products – categories that overlap with the financial data exposed in the Data Breaches.

134.   As a result of the Data Breaches, Anderson has spent time researching the Data Breaches, verifying the legitimacy of the Tulane and Drivestream Notice Letters, and contacting and coordinating with counsel.  Anderson will also spend more time dealing with the fallout of the Data Breaches, including taking time to mail requests for fraud alerts and/or credit freezes.  This is valuable time Anderson would otherwise have spent or would spend on other activities, including, but not limited to, work and/or recreation.

135.   Anderson and Class Members have incurred and/or will incur out-of-pocket expenses for postage from mailing requests for credit reports, fraud alerts, and/or credit freezes. Anderson has already incurred postage costs from mailing requests for her credit report to all three credit bureaus, so that she can review her credit file to monitor it for suspicious activity.

136.   Given Defendants' Data Breaches, Anderson does not feel comfortable using the monitoring services they selected.  At any rate, those services have only been offered for 12 months.  Anderson knows that her need for credit monitoring will last for the rest of her life.

137.   The Data Breach also caused Anderson and Class Members to suffer a diminution of value of their data.  The Louisiana Civil Code and Louisiana courts interpreting it categorizes private, electronic data – like Anderson's PII – as corporeal movable property.  Anderson's property (PII) was damaged and its value diminished from the Drivestream Data Breach, which

26

exposed her name, financial account number, and routing number.  Her PII's value was then further diminished by the Tulane Data Breach, which exposed her name, Social Security number, and direct deposit and banking information.

138.    As a result of the Data Breaches, Anderson suffered a loss of privacy.

139.    Additionally, due to the Data Breaches, Anderson will face a substantial risk of imminent harm for the rest of her life.

140.    Anderson anticipates spending additional time and money on an ongoing basis to try to mitigate and address the present and impending injuries caused by the Data Breaches.

141.    The substantial risk of harm and loss of privacy from the Data Breaches has caused Anderson to suffer fear, emotional distress, anxiety, annoyance, inconvenience, and nuisance.

142.    Anderson has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

143.    As a result of the Data Breaches, Anderson has also suffered injury directly and proximately caused by the Data Breaches, including: (i) her valuable PII was accessed by unauthorized third-parties; (ii) the imminent and certain impending injury flowing from fraud and identity theft posed by her PII being placed in authorized hands, including of potential cyber criminals; (iii) damages to and diminution in value of her PII that was entrusted to Defendants with the understanding that Defendants would safeguard the information against disclosure; (iv) loss of time that Anderson has had to expend in an attempt to ameliorate, mitigate, and address the consequences of the Data Breaches, with such steps being taken at the direction of Defendants; (v) out-of-pocket costs, like for postage; and (vi) continued risk to her PII, which remains in the

27

possession of Defendants and which is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect it.

**B.    Lewis's Experience**

144.    Lewis is a former employee of Tulane.  He worked for Tulane from approximately 2011 to approximately early 2025.

145.    Tulane collected, obtained, accepted, managed, stored, maintained, and processed and maintained Lewis's PII as a condition of his employment.

146.    Lewis greatly values his privacy and is very careful with his PII.

147.    In many instances, Lewis avoids using digital methods when storing, accessing, or transmitting his personal information.  He stores physical documents containing PII in a safe and secure location.

148.    When Lewis does use digital data methods, he takes steps to protect access to his data—including using facial recognition as a passcode for telephone access.

149.    Lewis has never knowingly transmitted crucial PII, such as his Social Security number, over the internet or other unsecured networks.

150.    When Lewis does entrust others (including Tulane) with his PII, he only does so when necessary, such as when it is a condition of employment.  Even then, he only provides his PII to others with the understanding that such information will be reasonably safeguarded from foreseeable threats; that it will only be shared when necessary; that it will only be shared with persons and entities that are properly vetted and overseen, and; that he will be timely notified if his data is exposed.

151.    On or about April 13, 2026, Lewis received a letter from Tulane.  The letter notified him of the Tulane Data Breach for the first time.  The letter advised that his PII – including his

28

name, Social Security number, direct deposit information, and banking information – was identified as having been accessed / acquired.  *See* Ex. 3, Lewis Tulane Notice Letter.

152.    Through the Tulane Data Breach, Defendants caused or contributed to Lewis's PII being exposed, thereby injuring him.

153.    Recognizing the present, immediate, and substantially increased risk of harm Class Members face, the Tulane Data Breach letter offers impacted individuals a one-year subscription to an identity protection support program.

154.    The Tulane Data Breach letter further instructs Class Members to take an array of measures to protect their personal information, including ordering a copy of their credit reports from Experian, Equifax, and TransUnion, setting up a fraud alert on their credit, and/or implementing a credit or security freeze by contacting Experian, Equifax, and TransUnion.

155.    On or about May 4, 2026, Anderson received a Drivestream Notice Letter dated April 29, 2026.  The Drivestream Notice Letter notified him for the first time that his PII (name, financial account number, and routing number) had been exposed, accessed, and downloaded between December 4, 2024 and December 9, 2024.  *See* Ex. 4, Lewis Drivestream Notice Letter.

156.    The Drivestream Notice Letter explained its role as an IT consulting company hired to facilitate Tulane's migration of employee data to its new human capital management system. The letter explained that, as part of that process, Lewis's PII was "present within [Drivestream's] systems" and that unauthorized actors accessed those systems and downloaded files from it.

157.    Through the Drivestream Data Breach, Defendants caused or contributed to Lewis's PII being exposed, thereby injuring his property.

158. Recognizing the present, immediate, and substantially increased risk of harm Class Members face, the Drivestream Notice Letter offers impacted individuals a one-year subscription to a credit monitoring and identity theft protection service.

159. The Drivestream Notice Letter also encourages Class Members to take measures to protect their personal information, including setting up a fraud alert and/or credit freeze by contacting Experian, Equifax, and TransUnion and requesting credit reports to monitor the reports for suspicious activity.

160. Lewis provided his PII to Tulane and, through Tulane, to Drivestream, and trusted Defendants to use reasonable measures to protect it according to Defendants' internal policies and federal and state law. Defendants collected, obtained, and accepted Lewis's PII. Defendants continue to manage, store, maintain, and/or process Lewis's PII and have a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

161. In the wake of the Data Breaches, Lewis has suffered from a surge in spam telephone calls and text messages.

162. As a result of the Data Breaches, Lewis has spent time researching the Data Breaches, verifying the legitimacy of the Tulane and Drivestream Notice Letters, and contacting, vetting, and coordinating with counsel. Lewis will also spend more time dealing with the fallout of the Data Breaches, including taking time to mail requests for credit reports, fraud alerts, and/or credit freezes. This is valuable time Lewis would otherwise have spent or would spend on other activities, including, but not limited to, work and/or recreation.

163. Lewis and Class Members have incurred and/or will incur out-of-pocket expenses for postage from mailing requests for credit reports, fraud alerts, and/or credit freezes. Lewis has

30

already incurred postage costs from mailing requests for his credit report to all three credit bureaus, so that he can review his credit file to monitor it for suspicious activity.

164. Given Defendants' Data Breaches, Lewis does not feel comfortable using the monitoring services they selected. At any rate, that service has only been offered for 12 months. Lewis knows that his need for credit monitoring will last for the rest of his life.

165. As a result of the Data Breaches, Lewis will face a substantial risk of imminent harm for the rest of his life.

166. Lewis anticipates spending additional time and money on an ongoing basis to try to mitigate and address the present and impending injuries caused by the Data Breaches.

167. The substantial risk of harm and loss of privacy from the Data Breaches has caused Lewis to suffer fear, anxiety, annoyance, inconvenience, and nuisance.

168. Lewis has a continuing interest in ensuring that his PII, which upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

169. The Data Breaches also caused Lewis and Class Members to suffer a diminution of value of their data. The Louisiana Civil Code and Louisiana courts interpreting it categorizes private, electronic data – like Lewis's PII – as corporeal movable property. Lewis's property (PII) was damaged and its value diminished from the Drivestream Data Breach, which exposed his name, financial account number, and routing number. His PII's value was then further diminished by the Tulane Data Breach, which exposed his name, Social Security number, and direct deposit and banking information.

170. As a result of the Data Breaches, Lewis has also suffered injury directly and proximately caused by the Data Breaches, including: (i) his valuable PII was accessed by unauthorized third-parties; (ii) the imminent and certain impending injury flowing from fraud and

31

identity theft posed by his PII being placed in authorized hands, including of potential cyber criminals; (iii) damages to and diminution in value of his PII that was entrusted to Defendants with the understanding that Defendants would safeguard the information against disclosure; (iv) loss of time that Lewis has had to expend in an attempt to ameliorate, mitigate, and address the consequences of the Data Breaches, with such steps being taken at the direction of Defendants; (v) out-of-pocket costs, like for postage; and (vi) continued risk to his PII, which remains in the possession of Defendants and which is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect it.

## VII.    CLASS ACTION ALLEGATIONS

171.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

172.    Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23.

173.    Plaintiffs seek to represent a class defined as follows, and all subject to confirmation, clarification, and/or modification based on discovery to be conducted in this action:

> **Nationwide Class:**  All individuals whose Personally Identifying Information was exposed to an unauthorized party as a result of the Tulane Data Breach and the Drivestream Data Breach (the "Class").

174.    Plaintiffs also seek to represent a Louisiana Subclass defined as follows, and all subject to confirmation, clarification, and/or modification based on discovery to be conducted in this action:

> **Louisiana Subclass:**    All Louisiana residents whose Personally Identifying Information was exposed to an unauthorized party as a result of the Tulane Data Breach and the Drivestream Data Breach (the "Louisiana Subclass").

175.    Excluded from the Class are: (1) Defendants and Defendants' parents, subsidiaries, affiliates, legal representatives, officers, directors, employees, assigns, successors, and any entity

32

in which Defendants have a controlling interest; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; (3) Class Counsel; and (4) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out.

176.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class and Louisiana Subclass before the Court determines whether certification is appropriate.

177.    The Class may be maintained in this case under Federal Rules of Civil Procedure 23(b)(3) for the reasons that follow.

178.    **<u>Numerosity</u>**:  While the exact number of Class Members is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Defendants – the very records Tulane and Drivestream used to send notices to Class Members.  There are more than 100 impacted individuals from Rhode Island alone.  Therefore, the Class Members are so numerous that the individual joinder of all Class Members is impracticable under Federal Rule of Civil Procedure 23(a)(1).

179.    **<u>Commonality</u>**:  There are common questions of law that exist as to all Class Members pursuant to Federal Rule of Civil Procedure 23(a)(2) and (b)(3).  Legal and factual issues common to the Class exist and predominate over any questions affecting only individual Class Members.  These common issues include, but are not limited to:

    a.    Whether Tulane violated the notification requirements of La. Rev. Stat. § 51:3074, persuasive evidence of negligence under Louisiana state law;

    b.    When Defendants actually first learned about the Data Breaches;

    c.    Whether and to what extent Defendants had a duty to protect the PII of Plaintiffs and Class Members;

    d.    Whether Defendants had duties not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

e. Whether Defendants failed to adequately safeguard the PII of Plaintiffs and Class Members;

f. Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in these Data Breaches;

h. Whether Defendants have adequately addressed and fixed the vulnerabilities which permitted the Data Breaches to occur;

i. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

j. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm;

k. Whether Drivestream negligently performed its duties as a risk-sharing partner with Tulane by negligently storing, managing, overseeing, and/or handling Class Members' PII in Tulane's systems, causing or contributing to the Tulane Data Breach;

l. Whether Tulane is vicariously liable under Doctrines of Respondeat Superior; and/or master-servant and principal and agent doctrines for Drivestream's wrongdoing;

m. Whether Tulane is directly liable for negligent vetting, hiring, training, and supervision of Drivestream; and

n. Whether Tulane is directly liable for inadequately securing and monitoring Class Members' PII in their internal systems.

180. **Typicality**:  Plaintiffs' claims are typical of the claims of the Class Members whom they seeks to represent under Federal Rule of Civil Procedure Rule 23(a)(3) because Plaintiffs and each Class Member had their PII compromised as a result of the Tulane – Drivestream partnership due to Defendants' misfeasance and because Class Members seek the same injunctive relief and the same or substantially similar monetary and/or nominal damages.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class Members.

181.    **Adequacy of Representation**:  Plaintiffs will fairly and adequately represent and protect the interests of the Class Members as required by Federal Rule of Civil Procedure 23(a)(4). Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Class Members.  Plaintiffs do not have any interest which might cause them to not vigorously pursue this action.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.  Therefore, the interests of the Class Members will be fairly and adequately protected.

182.    Further, Plaintiffs have retained competent counsel, including counsel experienced in complex class action litigation, including consumer protection and privacy cases.  Their chosen counsel has experience in complex litigation, including data privacy, and has the financial and legal resources to meet the costs and legal issues associated with this type of litigation.

183.    **Predominance & Superiority**:  A class action is the superior method for the fair and efficient adjudication of this controversy pursuant to Federal Rule of Civil Procedure 23(b). Prosecuting separate actions on behalf of individual Class Members would create a risk of inconsistent adjudications, including on Defendants' compliance with state laws central to the necessary question of tort duty in this litigation.  Furthermore, the adjudication of issues, like duty, in one individual matter will be dispositive of those issues in all individual cases.  The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.

184.    Additionally, questions of law and fact common to all Class Members predominate here.  There are few difficulties in managing this case as a class action, whereas there are many difficulties associated with proceeding on an individual basis.  It would be virtually impossible for individual Class Members to effectively redress the wrongs done to them.  Even if the Class

35

Members could afford such individual litigation, the court system could not. Individualized litigation presents the potential for inconsistent or contradictory judgments, including on central issues of federal law. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

185. **Ascertainability**: Class Members can be readily identified and notified based on Defendants' own records given that Defendants themselves concede that they have already conducted an investigation identifying the Class Member and that they have sent, or are sending, notification to impacted individuals. The very data in Defendants' custody or control that they used to compile and send the Drivestream Notice Letters and Tulane Notice Letters make the class ascertainable and, after discovery, will permit class notice.

186. **Policies Generally Applicable to Class Members:** The Class may also be maintained in this case under Federal Rules of Civil Procedure 23(b)(2) for the reasons set forth above as well as because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief is appropriate respecting the Class as a whole. This requires the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

187. Unless a Class-wide injunction is issued, Defendants may continue in the failure to properly secure the Class Members' PII or continue to act otherwise unlawfully as set forth herein.

36

## VIII.  CAUSES OF ACTION

### COUNT ONE
### NEGLIGENCE (LA. C.C. art. 2315 *et seq.*)

188.    Plaintiffs and Class Members repeat and re-allege each allegation as if fully set forth herein.

189.    Plaintiffs and Class Members entrusted their PII to their employer (Tulane) and, through Tulane, to Drivestream, on the premise and with the understanding that Defendants would safeguard their information and/or protect their PII from unauthorized third parties.

190.    Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class Members could and would suffer if the PII were wrongfully disclosed.

191.    Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, obtaining, accepting, managing, storing, maintaining, and processing of Plaintiffs' and Class Members' PII involved an unreasonable risk of harm to Plaintiffs and Class Members, including if the harm occurred through the acts of a third party.

192.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and Class Members was reasonably foreseeable, due to the nature of Defendants' industries handling PII related to human capital management for educational institutions, particularly in light of known data breach trends and Defendants' inadequate security practices.  For instance, Akira was a known threat actor in March 2023, approximately a year and a half before the Drivestream Data Breach.

193.    Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures.  Defendants knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and Class Members, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendants' systems.

37

194. By collecting, obtaining, accepting, managing, storing, maintaining, and processing Plaintiffs' and Class Members' PII, Defendants had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

195. Plaintiffs and Class Members had no ability to protect their PII that was in, and remains in, Defendants' possession.

196. Defendants knew or should have known that Plaintiffs' and Class Members' PII was stored on their storage systems and were or should have been aware of the extreme risks associated with failing to properly safeguard Plaintiffs' and Class Members' PII.

197. Defendants have and continue to have a duty to adequately disclose that Plaintiffs' and Class Members' PII within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was and is necessary to allow Plaintiffs and Class Members to take steps to prevent, mitigate, and remediate the exposure of their PII to unauthorized third parties.

198. Defendants had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiffs and Class Members.

199. Defendants had a duty to comply with Section 5 of the FTC Act. The FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC Act, the unfair act or practice by businesses of failing to use reasonable measures to protect PII. The FTC Act has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.[35] Defendants' noncompliance with these standards, identified herein, is

---

[35] *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

essential to determining their duty, a necessary element of the state law negligence claim. Furthermore, determining Defendants' failure to comply with the FTC Act harmonizes the balance of responsibilities in between federal and state courts by encouraging compliance with federal law.

200.    Defendants had a duty to comply with Louisiana Revised Statute § 51:3074(A), which requires "[a]ny person that conducts business in [Louisiana] or that owns or licenses computerized data that includes personal information" to "implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

201.    Defendants also had a duty to comply with the notice requirements of Louisiana Revised Statute § 51:3074(C-D), which requires that (i) any person or agency that owns or licenses computerized data must notify Louisiana individuals whose PII  was, or is reasonably believed to have been, accessed by an unauthorized person following discovery of a data breach, and (ii) any agency or person that maintains (but does not own) PII must notify the owner or licensee of that data following discovery of the breach if the PII was, or is reasonably believed to have been, accessed by an unauthorized person through a security breach following discovery of the data breach.

202.    Defendants also had a duty to comply with the notice requirements of Louisiana Revised Statute § 51:3074(E), which requires timely notice that is made "in the most expedient time possible and without unreasonable delay but not later than sixty days from the discovery of the breach."

203.    Defendants were and are in the best position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breaches.  Yet, Defendants, through their actions and/or omissions, unlawfully breached their duties to Plaintiffs and the Class Members by

39

failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the Plaintiffs' and Class Members' PII during the time the PII was within Defendants' possession or control.  Specifically, Defendants improperly and inadequately safeguarded the PII of Plaintiffs and Class Members in violation of the law and standard industry rules, regulations, and practices at the time of the Data Breaches, as set forth below:

a. *Tulane's direct negligence includes, but is not limited to, the following actions or* *inactions:*

i. Failure to design, maintain, test, and implement security protocols to ensure that Plaintiffs' and Class Members' PII of in Tulane's possession was adequately secured and protected;

ii. Failure to design, maintain, test, verify, and implement security protocols to ensure that its partners, contractors, and agents (including Drivestream) adequately secured and protected the PII of Plaintiffs and the Class Members;

iii. Failure to have procedures in place to detect and prevent the improper access and misuse of the PII of Plaintiffs and Class Members;

iv. Failure to have appropriate procedures in place to detect and prevent dissemination of PII of Plaintiffs and Class Members;

v. Failure to heed industry warnings and alerts to provide adequate safeguards to protect the PII of Plaintiffs and Class Members in the face of increased risk of theft;

vi. Failure to adequately disclose the existence and scope of the Tulane Data Breach of Plaintiffs' and Class Members' PII;

40

vii. Failure to timely disclose the existence and scope of the Drivestream Data Breach of Plaintiffs' and Class Members' PII;

viii. Failure to conduct sufficient and adequate vetting, hiring, and due diligence checks before retaining Drivestream to handle the preparation and migration of Plaintiffs and the Class Members' PII to a new human capital management system;

ix. Failure to conduct sufficient and adequate training of its chosen partners, contractors, and agents (including Drivestream) to ensure Plaintiffs and the Class Members' PII was handled with due care;

x. Failure to adequately supervise its chosen partners, contractors, and agents (including Drivestream) to ensure Plaintiffs and the Class Members' PII was handled with due care;

xi. Failure to comply with industry standards for the safekeeping of the PII of Plaintiffs and Class Members, including basic encryption and/or other safety techniques available to Defendants;

xii. Failure to safeguard the PII through reasonable and appropriate data security methods and measures to protect Plaintiffs' and Class Members' PII as required by the Section 5 of the FTC Act and applicable industry standards – evidence of negligence under Louisiana's negligence *per se*;

xiii. Failure to comply with Louisiana Revised Statute § 51:3074(A)'s requirement to "implement and maintain reasonable security procedures and practices" – evidence of negligence under Louisiana's negligence *per se*);

41

xiv.   Failure to comply with Louisiana Revised Statute § 51:3074(C-D)'s notice provisions – evidence of negligence under Louisiana's negligence *per se*;

xv.   Failure to comply with the timeliness requirement of Louisiana Revised Statute § 51:3074(E) – evidence of negligence under Louisiana's negligence *per se*; and

xvi.   Imprudence or want of skill.

b.      ***Tulane's indirect negligence*** arises from the negligence by Drivestream (as set forth below) and per applicable Louisiana law including, but not limited to, the doctrines of respondeat superior; principal and agent; vicarious liability; and/or master-servant doctrines, Tulane is a proper party-defendant and is responsible for the negligence and/or liability attributed to Drivestream.

c.      ***Drivestream, as an IT consultant specializing in Oracle systems, had a heightened duty of care towards Plaintiffs.  Drivestream's direct negligence includes, but is not limited to, the following actions or inactions:***

i.   Failure to design, maintain, test, and implement security protocols to ensure that the PII of Plaintiffs and the Class Members in Drivestream's possession was adequately secured and protected;

ii.   Failure to warn Tulane and/or Plaintiffs and Class Members of security breaches of Drivestream's systems;

iii.   Failure to warn Tulane and/or Plaintiffs and Class Members of security breaches and vulnerabilities in Tulane's systems;

iv.   Failure to have procedures in place to detect and prevent the improper access and misuse of the PII of Plaintiffs and Class Members;

42

v.   Failure to have appropriate procedures in place to detect and prevent dissemination of PII of Plaintiffs and Class Members;

vi.   Failure to heed industry warnings and alerts to provide adequate safeguards to protect the PII of Plaintiffs and Class Members in the face of increased risk of theft;

vii.   Failure to adequately disclose the existence and scope of the Drivestream Data Breach of Plaintiffs' and Class Members' PII;

viii.   Failure to timely disclose the existence and scope of the Drivestream Data Breach of Plaintiffs' and Class Members' PII;

ix.   Failure to safeguard the PII through reasonable and appropriate data security methods and measures to protect Plaintiffs' and Class Members' PII as required by the Section 5 of the FTC Act and applicable industry standards – evidence of negligence under Louisiana's negligence *per se*;

x.   Failure to comply with Louisiana Revised Statute § 51:3074(A)'s requirement to "implement and maintain reasonable security procedures and practices" – evidence of negligence under Louisiana's negligence *per se*);

xi.   Failure to comply with Louisiana Revised Statute § 51:3074(C-D)'s notice provisions – evidence of negligence under Louisiana's negligence *per se*;

xii.   Failure to comply with the timeliness requirement of Louisiana Revised Statute § 51:3074(E) – evidence of negligence under Louisiana's negligence *per se*;

43

xiii. Negligent misrepresentation of its skill and the scope of its services, including negligent misrepresentation of its technology, Oracle, and educational institutional workforce expertise; and

xiv. Imprudence or want of skill.

204. But for Defendants' wrongful and negligent breach of duties owed to Plaintiffs and Class Members, the PII of Plaintiffs and Class Members would not have been compromised.

205. Plaintiffs and Class Members suffered an injury when their PII was accessed, downloaded, and acquired by unauthorized third parties.

206. There is a close causal connection between Defendants' failure to implement security measures to protect the compromised PII and the harm and increased risk of imminent harm suffered by Plaintiffs and Class Members.

207. The PII of Plaintiffs and Class Members was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

208. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) property damage to their electronic data / PII; (ii) diminution of their PII's value; (iii) the loss of the opportunity to control how their PII is used; (iv) costs associated with placing freezes and/or fraud alerts on credit reports and/or obtaining copies of their credit reports to monitor them for suspicious activity; (v) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (vi) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and continuing consequences of the Data Breaches, including but not limited to, efforts spent

researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vii) the compromise, publication, and/or theft of their PII; (viii) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII of Plaintiffs and Class Members; (ix) imminent risk of identity theft; and (x) present and continuing costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breaches for the remainder of the lives of Plaintiffs and Class Members.

209.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

210.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members are entitled to recover actual, consequential, nominal, and injunctive relief.

## COUNT TWO
## BREACH OF LOUISIANA'S UNFAIR TRADE PRACTICES ACT
### *Individually and on Behalf of the Louisiana Subclass*

211.    Plaintiffs and Louisiana Subclass Members repeat and re-allege each allegation in the Complaint as if fully set forth herein.

212.    The Louisiana Unfair Trade Practices Act ("LUTPA"), La. R.S. 51:1405, states that all "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

213.    At all relevant times, Defendants were engaged in trade or commerce within the meaning of LUTPA.  Tulane operates as a large private research university engaged in commercial transactions including employment relationships, vendor contracts, and financial aid

45

administration.  Drivestream is a for-profit IT consulting corporation whose business consists of commercial Oracle Cloud implementation and support services, especially for educational institutions.

214.   LUTPA provides a cause of action to "[a]ny person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act, or practice."  La. R.S. 51:1409.

215.   Violations of Louisiana's Database Security Breach Notification Law, Louisiana Revised Statute § 51:3071 *et seq.* constitute unfair acts or practices under the LUTPA.

216.   Tulane engaged in unfair and deceptive acts and practices in violation of LUTPA by, among other things:

> i.   Failing to comply with Louisiana Revised Statute § 51:3074(A)'s requirement to "implement and maintain reasonable security procedures and practices."
>
> ii.  Failing to comply with Louisiana Revised Statute § 51:3074(C)'s notice provisions by <u>waiting approximately 4 months</u> after learning of the Tulane Data Breach to notify Class Members of it.

217.   Drivestream engaged in unfair and deceptive acts and practices in violation of LUTPA by, among other things:

> i.   Failing to comply with Louisiana Revised Statute § 51:3074(A)'s requirement to "implement and maintain reasonable security procedures and practices."

ii. Failing to comply with Louisiana Revised Statute § 51:3074(C)'s notice provisions by <u>waiting approximately 16 months</u> after first learning of the Drivestream Data Breach to notify Class Members of it.

iii. Upon information and belief, failing to comply with Louisiana Revised Statute § 51:3074(D)'s requirement to provide notice to Tulane of the Drivestream Data Breach.

218. Defendants' unfair and deceptive acts and practices were the proximate cause of ascertainable losses suffered by Plaintiffs and Class Members, including: (i) economic damages, such as postage costs associated with mitigating their credit risks; (ii) property damage to their PII resulting in the diminution in value of their PII; (iii) lost time spent responding to and mitigating the effects of the breach; and (iv) fear, emotional distress, anxiety, annoyance, inconvenience, and nuisance.

219. As a direct and proximate result of Defendants' LUTPA violations, Plaintiffs and Class Members are entitled to recover actual, consequential, nominal, and injunctive relief.

**COUNT THREE**
**UNJUST ENRICHMENT**
**<u>(AGAINST DRIVESTREAM ONLY AND IN THE ALTERNATIVE)</u>**

189. Plaintiffs and Class Members repeat and re-allege each allegation in the Complaint as if fully set forth herein.

190. In the alternative, should it be determined that there are no other alternatives at law, Plaintiffs and Class members bring this claim of unjust enrichment against Drivestream.

191. Tulane provided Drivestream with access to Plaintiffs' and Class Members' PII and hired Drivestream specifically to handle its data migration from Tulane's legacy, on-premises system to its new Cloud-based system – including preparing/processing information from the legacy system for the transfer.

47

192.    As part of that agreement Drivestream received compensation and was enriched.

193.    Due to Drivestream's actions – including its failure to protect data on its own servers, its failure to adequately and reasonably implement its IT-expertise duties to Tulane, and its notification failures, Plaintiffs and Class Members were impoverished – including through out-of-pocket costs (*e.g.*, postage) and through property damage to their PII resulting in a diminution of value.

194.    Drivestream's actions and inactions as described herein caused Plaintiffs' and Class Members' impoverishment.

195.    There is no direct contractual legal relationship between Class Members and Drivestream, and as such no justification or cause for Drivestream's enrichment at the expense of Class Members.

## IX.    PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendants as follows:

A.    An order certifying the proposed Class, designating Plaintiffs as named representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

B.    Equitable and injunctive relief enjoining Defendants from engaging in the wrongful conduct complained of herein and requiring Defendants to affirmatively protect data through best practices including, but not limited to, encryption, deleting and purging PII that is no longer needed; enhanced auditing, testing, and training for personnel regarding new security procedures; and all other therapeutic reforms necessary;

48

C.     Money damages, in the form of actual, nominal, and consequential damages in an amount to be determined by a jury at trial;

D.     Reasonable attorneys' and experts' fees and costs;

E.     Pre-judgment and post-judgment interest, as provided by law; and

F.     Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all claims so triable.

DATED: May 19, 2026

Respectfully submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**

*/s/ Casey C. DeReus*
Casey C. DeReus (LA Bar #37096)
  dereus@bespc.com
Melissa A. Fortunato (CA Bar #319767)
    *PRO HAC VICE TO BE FILED*
  fortunato@bespc.com
810 Seventh Avenue, Suite 620
New York, NY 10019
Telephone:  (212) 308-5858
Facsimile: (212) 486-0462

and

**BEY & ASSOCIATES, LLC**

*/s/ Garret S. DeReus*
Garret S. DeReus, Bar No. 35105
  gdereus@beyandassociates.com
650 Poydras St., Suite 2610
New Orleans, LA 70130
Telephone:  (504) 229-5740 (direct)